The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H. D. Armon presiding. Good afternoon, Counsel. The next case we'll call is 4-22-0824 in the State of Anderson v. Shane Larson. Could Counsel for the Appellant please state your name for the record. August Appleton on behalf of Appellant Deborah Hopitos. Thank you, sir. And Counselor for the Appellate, could you please state your name for the record. Yes, Mark Cochran for Shane Larson as Executive of the Darlene Anderson Estate. Thank you, Counsel. Counselor for the Appellant, you may proceed. Thank you, Your Honor. May it please the Court, opposing Counsel. In this appeal, my client, the Appellant Deborah Hopitos, and plaintiff in the underlying action, asked this Court to reverse the finding of summary judgment in favor of Defendant Shane Larson as Executive of the Estate of Darlene Anderson, deceased, and instead find partial summary judgments in her favor. So we ask the Court to vacate the order entered September 14, 2022, and enter an order consistent with the proposed order that was submitted by Counsel in the underlying record, starting at C-1573. We also ask that this Court reverse the order quashing subpoenas for the personal and business bank accounts of Darlene Anderson, and also the motion to reconsider that was denied seeking to reverse that order. Essentially, this is a case about fiduciary obligations. There's no question of fact that upon the death of Helen Anderson in 2003, that Dwight Anderson became a fiduciary to the estate. There was a trust that was left for all of her assets were supposed to be placed in that trust. Now, the successor trustees after Helen Anderson were Dwight Anderson, her husband, and her daughter, Darlene Anderson. My client was successor trustee, but a remainder beneficiary of the initial trust, a family trust. Given that the fiduciary obligation requires the utmost honesty and fidelity when protecting assets, I believe there is no question of fact that there is a breach of trust when initially following the death of Helen Anderson and pursuant to her probate estate, the properties were transferred first to a Dwight Anderson trust. Then the probate estate listed two assets, but my allegation showed that there were additional assets through a receivable that Helen Anderson had created. Now, the various documents attached to my motion for summary judgment lay out the pieces that were utilized to discover and assess the damages that my client suffered as a sole remaining beneficiary and sole successor trustee of the Helen Anderson trust. Helen Anderson created this trust with the intent that her daughters would share in the proceeds upon the passing of her husband. Unfortunately, when her husband passed, there were no assets to be held in that trust. Now, if Darlene Anderson had not actually received the benefits of the trust, there would be a good argument that the trust never existed. However, two properties had to go through the trust in order to, as opposing counsel has stated, to clean up issues with that title. That title cleaned up issues in order to allow the sale of those properties, but did not clean up issues involving the beneficiaries of the trust and the duties of the trustee to account and fully disclose all happenings with the trust. The evidence uncovered through business records and subpoenas clearly shows that Helen Anderson had interest in four parcels of real estate upon her death, and those parcels, two of which were in a corporation, two of which were in her name individually. The corporate assets never made it into her inventory and were instead concealed from that record. Now, in looking at what occurred with those properties, you will see in my brief that I have a description of the various properties going by the commonly known names. There were two restaurants called Lou Bob and Circle B that Ms. Anderson owned in a corporation. She had a vacant 2.56 acre parcel that adjoined the Lou Bob restaurant, and then also a 38 acre parcel that she commonly referred to as Prairie House. Now, through the history, these properties were liquidated in part. In my proposed order, I state that in breach of fiduciary duty that the trust suffered damages through the liquidation of this property. The sale of Circle B, a corporation that was held by Lou Bob, and liquidated in July of 2017, where Dwight Anderson received $170,000. And then also a sale of the 2.56 acres, a portion of that with Lou Bob, where Dwight Anderson received $155,000. In my order, I request that judgment enter in the amount as of September 1, 2022, and $530,890.16. Given the standard of a summary judgment, which is all facts are construed against a non-moving party, I believe the court erred in entering summary judgment in favor of my defendant. First, the order itself shows multiple facts misconstrued against Ms. Hopitas. First, it holds the time accountable against her. It finds that she does not have an expectation. There's various portions of that order where I don't believe the court applied the appropriate standard. Now, going to the standard with Deborah Hopitas, because of the failure to account, the standard is that all obscurities would be construed against Darlene Anderson. And there's no question of fact that she received the benefit of these monies through remainder interest that she received from her father. And the will and trust that are before this court at issue, she receives all benefits of land in Bond County, land in Corporations Lou Bob and Darlene Deb, which are the subject of the breach of fiduciary duty and constructive trust claims. So I'd ask that judgment be entered on breach of fiduciary duty, and then the cause be remanded for further calculation of damages and also discovery into the assets of Darlene Anderson. I'd like to ask. Yes. This is a factually very complicated case and difficult to follow. Lots of things spread over many years, but there's one thing that I noted here, which I'd like you to explain perhaps clarify. Yes, and that is the accountant who provided the appraisal for the. I guess Helen's trust noted the following and this is a quote, Helen a Helen L Anderson is elected to omit substantially all of the disclosures required by generally accepted accounting principles unquote. So my question is, what's that all about, and what does it mean with regard to the accounting that was done and how should the trial court in this court understand all this. Yes, and I understand the court's concern regarding that provision. My response is that that document is almost demonstrative. And what it states, it is corroborated by other documents in the record. And as noted before, I actually show the monies received from those properties at their liquidation going directly to Dwight Anderson and then to Darlene Anderson. And so while accounting, there was a waiver, a general accounting principles, that is a business record showing what Helen Anderson disclosed to her accountants, and it's corroborated by the various other records that are either for business records or records found in the public record. Was Dwight's inventory accepted by the probate court. They did close the case, but it was a pro se filing and there was no indication that there was any other parties there. But the trial court approved the inventory and closed the. It did, it did, Your Honor, and under independent administration, that is not binding on an error that or a beneficiary that files a waiver. And what is binding in the absence of fraud or mistake. And so we're out alleging that there was fraud or mistake in that. And further, my client never signed a waiver and there's no proof of notice as to her receiving notice of that proceeding. So to continue on. And either the name of Dwight Anderson, or perhaps Darlene Anderson, and his estate or her estate. And then also there are the proceeds from the essentially purchase agreement contract for deed for the Prairie House, which they continue to receive payments. And then also any further potential interest in Lubav, which I do not believe was included in my request, requested order before the trial court. Now, moving on to the next claim, the issue of the tortious interference involving the estate of Dwight Anderson and the various trusts that were drafted. On his behalf. I believe the court erred in the 1st issue is the finding that there was no existence of an expectancy. My clients was in there. So I believe there's presumed existence of expectancy. And then an intestate estate, given her 2 sisters being alive while her when her father died, she would have received 130 of the estate. And following then she would have had an interest in her sister. Linda Anderson's estate as well. So, I believe there was an existence of an expectancy and there are the deeds that were found. Are more an indication of specific dispositions that Dwight intended to make pursuant to his expectancy that he would provide for his daughters and passing. And so I believe that the court error and finding that there was no expectancy. And I believe that the estate plan would interfere with that expectancy to receive that land outright. 1 thing that I would note to the court is the similarities in the disposition of the lands as to what Darlene Anderson received through the later estate plans and a deed that was actually filed following Dwight's death. Versus the land that was placed in trust, which constitutes all of the land that Deborah would have received in those deeds and really count 3 swings on an analysis of undue influence and the shifting presumptions. Notably, the court did find that because Darlene Anderson was a fiduciary that there is a presumption of undue influence. But I believe the court erred in finding in the facts, construing the facts in favor of my client, Deborah, that there was clear and convincing evidence as to the purposes of the disposition through the statements of Mike Barton. I think in the light most favorable to Deborah, her sister was heavily involved in these estate plans. She was communicating primarily with Barton regarding what was involved while acting as her father's fiduciary. And that there were missteps in the underlying trust, leading to breach of fiduciary duty and Helen Anderson's case. Maybe in an evidentiary hearing, subject to cross examination. The testimony, Mr. Barton regarding the estate and other potential testimony regarding Dwight's mental condition around those times would allow a court to make a clear and convincing finding. But I think in summary, judgment is an error. So I believe that the court should actually be partially affirmed in the finding that there was a presumption of undue influence, given the fiduciary nature of Darlene's involvement in these estate plans. But should remand for a hearing on whether or not there is actually clear and convincing rebuttal evidence to rebut that presumption. And obviously, as the court knows that that presumption is rebutted, that there would generally be a hearing, just all out hearing pursuant to the NEMI case, first district case cited in my brief. And so, therefore, based on that, I would ask that the court enter an order consistent with the proposed order on the record that grants partial summary judgment with the finding of the presumption of undue influence remains the matter for a hearing on clear and convincing evidence after further discovery. Count five, which is a constructive trust related to those dispositions in Dwight Anderson's estate, I think would swing on count three. So I believe that the court should just remand that vacate summary judgment finding in favor of the defendant remand. And then count seven, which is a spoliation count. I believe the court erred in finding that there was no duty because the allegations that there were documents related to Helen Anderson's estate that were destroyed. I believe the court erred in finding that there was no duty to preserve those documents, given that Darlene Anderson was a co-trustee of a trust that was the appropriate owner of those records. There was a duty to preserve that information so that beneficiary and successor co-trustee Deborah Hopitas could review and affirm what happened with her mother's estate. Lastly, I believe the court erred in its finding that the affidavit of Crystal Brockman would be barred by the Dead Man's Act because Crystal Brockman was not a beneficiary of the Helen Anderson estates or trust. She was a partial beneficiary of the Dwight Anderson estate plans, and so those are not at issue with the event of the potential burning of the documents. So therefore, I do not see how they're barred by the Dead Man's Act. I believe the court erred in that finding. So overall, I'm asking that the court vacate the order's summary judgment and enter partial summary judgment consistent with the proposed order that I submitted to the court beginning at C-1573. Now, in regards to the motion to quash, these were subpoenas that were issued for Darlene's personal and business bank records after she was deceased. They are directly relevant to what she was doing with funds that she received following her dad's passing and before. There is evidence that presented in the record that proceeds from the sale in 2017, where I believe about $170,000 were received, were used to purchase a building that she was operating her business out of. I believe that is highly relevant and that the privacy concerns are essentially moot, considering her own executor has access to those records and would obviously not have some duty of privacy between the two of them or some right of privacy. And so, notably, there were three subpoenas that were sought to be quashed, and one of them, I believe from Midland Bank, was received wherein it was discovered that $60,000 was removed from Lubob Bank account in 2020 after Dwight's death. And then also my client was a signatory on that account. She could have gotten that without the subpoena. So I believe that that subpoena was improperly quashed, that it should have been allowed because it was likely to lead to relevant information. Further, the court could have entered a protective order if it had real concerns of privacy and allowed the inspection of those records for potential damages. So it is my position that the court erred in both the quashing of that motion and also the denial of the motion reconsidered related to that quash. Mr. Appleton, I'd like to go back to the very beginning. How do you suppose the trial court concluded that Helen's trust wasn't funded or solemn at the time of her death? Well, I believe that the trial court found that it wasn't funded at the time of her death based on the representations in that probate inventory. However, I do believe that that was an error because assets such as the stock and the debt could have been transferred pretty easily through a familial agreement that didn't necessitate a transfer of probate. You wouldn't have needed letters of office to go to the Funderburks who bought some of that stock and said, hey, you owe grandma debt. So I believe that the trial court was misguided by that, and I'm believing that the probate was essentially an end finding as to what was in that trust. And so there were assets that were not in probate that should have gone to the trust. That's where part of the initial breach was, and I don't believe the probate and the final court in this matter saw it like that. Okay, thank you. Anything further? Nothing further, Your Honor, unless you have further questions. All right. I see none. Counsel for the appellee, you can proceed. Thank you and good afternoon. I'm not going to repeat what's presented in our brief since I know you're all familiar with what's in it. I will give you a brief summary of our position. But before doing that, I think it's necessary to comment on some of the assertions made by Mr. Appleton, either in his reply brief or in his argument this afternoon that we haven't previously had an opportunity to respond to. First of all, with respect to his reply brief, at the bottom of page seven of his brief, he makes the assertion that there's no evidence contradicting Deborah's assertion that she never received a copy of the trust and did not know its contents until 2020. It's clearly a false assertion. Deborah signed that document in 2002. Her signature's on it. It's in the record. So if she now claims she didn't know what was in it, she's still charged with knowledge of what's in that. So that was clearly a false assertion in their reply brief. Second, on page two of the brief, under the standard of review, Mr. Appleton asserts that our position is that the standard of review on discovery is de novo. That's absolutely not true. We clearly state in our brief at page 12 that the standard is manifest abuse of discretion with respect to discovery. But he distorted that and saying that our position was de novo. So that's the second example. Third one I'll point you to, on page 13 of his brief, they reference certain evidence they claim that Shane Larson admitted to Philip Apatow, the plaintiff's son. It's clearly inadmissible hearsay that he's included in there. With respect to his arguments today, he's added another one. He's made an argument with respect to an intestate share that Deborah would have been entitled to. This is not an intestate situation. Dwight had a will. It was test state. So the intestacy rules have no application. She had no expectation of getting an intestate share because Dwight had a will. He made provision for how the state was going to be distributed. With respect to our position, we view there's two parts. There's the Helen Anderson part, and there's the Dwight Anderson part. I think the Helen Anderson part is very straightforward. Her estate was insolvent at her death. Therefore, there was no residue to fund her trust, and the trust never came into being. So all these theories and fiduciary theories are irrelevant because that trust didn't come into being. Now we're almost 18 years later, Deborah and Mr. Apatow are asserting that that was a fraudulent probate proceeding. A number of things they assert. One, they assert that it didn't include the Lubav Corporation. We have in the record the affidavit of Mr. Thunderbird, who was Helen Anderson's brother, that he bought her sole share in Lubav two months prior to her death. So at her death, she had no interest in Lubav Corporation, and that's why it was not included in the inventory. Second point, he references two properties. These were owned by the Darlene Corporation that he says were grossly undervalued. Dwight Anderson valued those two properties at the exact value that the supervisor of assessment set for 2003, the year of her death. It's hard to imagine that being fraudulent. Certainly weren't undervalued. The last thing he references are these accounts receivables. It was brought up earlier. He's basing it on a 1997 report. That's over six years prior to her death that identifies about 500,000 accounts receivables. First of all, I don't think there's any relevance to her financial situation six years later at her death, these accounts receivables. Plus, there's no documentation as to what these accounts receivables related to. They indicate they are from her own corporations, her own corporations, receivables from her own corporation that they admit had no value. These were reported in 1997, so that means they, in theory, accrued prior to that. There's a question, even if they existed, whether there's any possible recovery for them in 2005 or 2006 when this probate was going on. I think that clearly is not a basis for including that it wasn't solvent. I think the end of the story is her estate was insolvent, and the probate judge at that time had all this available information. He made that decision and issued a clear final ruling that the state was insolvent, all that, whatever the proceeds were given, and he also indicated that notice had been waived. So I think it's very clear that that ends the story with respect to Helen Anderson. Council, let me ask you the same question I asked Mr. Appleton, that is, with regard to the statement of the accountant, who Helen Anderson has elected to omit substantially all the disclosures required by generally accepting accounting principles. This is a complicated case. I'm trying to figure out, one, what does that mean? What inferences can be drawn from it? And two, how does that affect the matter you just addressed? I think it further reinforces our position that that 97 report is of no value, because it was prepared for Helen Anderson's own benefit, and she intentionally elected to exclude all the normal disclosures that have been required. And that's why the accountant, from what I'm looking at, put a lot of caveats in there. So to put any credence in that report, when it's six years prior to her death, and it clearly doesn't meet the high standards. Council, we're not talking about the six-year delay, we're talking about her intentionally omitting matters that ought normally to be in the report. What's that all about? I can only speculate that she was omitting ones that she thought might negatively affect her balance sheet or her presentation of financials to lenders she was trying to secure financing from. I'm sure that those reports were related to financing she was trying to secure for her operations in the Greenville area. Okay. I think that's Helen's picture. Now with respect to Dwight, there's just a couple points I want to make. During all this estate planning period, I think it's important to realize it was Deborah who was living in the same house with Dwight, her father. It was not Darlene. So it was Deborah who was in intimate close contact with her father through this whole period. Second point, Deborah was not disinherited by her father. She has a lifetime use of the home she's lived in for the last 30 years. That goes through her lifetime. She also is given a lifetime income from a number of rental properties that are out there in the complex. Plus she's given one half the proceeds of any future timber sales from the property out there. So she has substantial provisions under the final documents of her father. And finally, I think Dwight's estate planning documents represent a logical, rational evolution of his plans based on changing circumstances. And I think that's demonstrated by the documents themselves. I think it's clearly demonstrated by the testimony of Attorney Barton, who worked with Dwight Anderson to develop and knows the reasons behind them. And probably of great importance, they're independently corroborated by public records with respect to Deborah's two children, which clearly provide a basis for why Dwight would conclude that he wanted to disinherit his two grandchildren, Deborah's two children. So I think there's a clear, rational explanation for what he did. Just to close, we're at a point now that all the other principals are dead. Helen, Dwight, Darlene, Linda Anderson are all deceased. Deborah should not be allowed now to create a false reality aided by her attorney as to what happened with her father. Whether Deborah is motivated by personal feelings of slight or a motherly reaction that her children are being disinherited, she can't be allowed to thwart the legitimate wishes of her father, Dwight Anderson. Importantly, we request that the court affirm all the trial court orders in this manner. And I see that I have some time left with questions, but Attorney Sheehan is also present here. If he would want to add anything, if the court would indulge him, if he has any comments to add, I don't know if he does. Otherwise, I'd be happy to answer any further questions. I believe there are any questions. Thank you, counsel. Mr. Appleton, rebuttal. Yeah, first of all, in regards to my client's assertions about her knowledge of what was in the trust, there was not a false assertion. The trust does show that in 2002, when Helen Anderson created it, that she did have her family sign the trust. It doesn't say that she was provided a copy of the trust. It doesn't say that she reviewed every aspect of the trust. It just says that she signed and accepted her position. However, over the course of the next 20 years, those aspects were concealed from her. The 1997 accounting report, as I said, is just a starting point. It's a guidepost as to what Helen Anderson actually owed. I'm not going in and saying enter judgment in the amount of what her debt assets were on that date. As you can see, through the drafting of my motion for summary judgment, through the drafting of the final order, I sharpened up the exact numbers as to what we were seeking. What we're seeking in damages are funds that Darlene Anderson actually received through her father, Dwight, through the liquidation of properties that were previously owned by her mother. There is a duty to account. If there was an accounting that showed exactly how Dwight or Darlene contributed these properties to earn the equity in them, that would absolve a lot of the issues here. However, because there's not, all inferences are construed against her, even in the light most favorable to her. And so she got $170,000 in July of 2017. I'm sorry, there's a train. I can't avoid the track by my house or by my office. $155,000 was received in March of 2019, and then payments on a contract for purchase for $250,000. Where did all these assets come from? The only logical explanation that I can see, and there hasn't been any facts to discredit this, is that they came from what Helen Anderson earned and collected during her life. There was a breach of the trust. Now, in regards to a statement regarding Philip Hofstoss' affidavit, where he alleges that there was a statement to Shane Larson, where Shane Larson admitted that Darlene was essentially acting on Dwight's behalf. I don't believe that that's hearsay. First of all, it's an alleged statement of a party. He's more than welcome to file his own affidavit saying that that didn't happen. And I believe that what that does is it just basically opens the door that there are some admissions that Shane knew what was going on with Darlene and Dwight that could be solicited from him, despite them not being here to actually testify. In regards to the expectancy, she was Dwight's daughter. I believe that there was a reasonable expectancy before the involvement of Darlene at Mr. Martin's office. There is no evidence that she was disinherited in any way that has been brought, and the deeds corroborate what she believes her expectancy to be. And so we'd ask that the order of the courts as previously described be vacated and reversed. Now, further, there continue to be facts that are construed against Deborah as the non-moving party, including the relationship between her and her father residing at the same place, and also the issues involving her children. One of the things that's always struck me is everybody continued to live here for years, despite there being these alleged issues with Dwight and getting along with his daughter and children. It wasn't until after he passed away that it was discovered that Deborah would get less than what she had contemplated. I don't believe that there's a false reality. I believe that that fits in with the belief of a close-knit family where one of the siblings was colluding and pushing a parent to do something and concealing it from the other sibling. So for all those reasons stated, unless the court has any questions, I just ask that your honor reverse the orders of the trial court and enter judgments as requested in my brief. Thank you, counsel. We'll take this matter under advisement. The court stands in recess.